FILED
United States Court of Appeals
Tenth Circuit

January 27, 2010

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

TODD ANDERSON,

　　　　Plaintiff-Appellant,

v.

AOL, LLC, formerly known as
America Online, Inc.,

　　　　Defendant-Appellee.

No. 09-6036

(D.C. No. CV-07-00201-F)
(W.D. Okla.)

ORDER AND JUDGMENT[*]

Before **HENRY,** Chief Judge, **BRISCOE,** and **HARTZ**, Circuit Judges.

Plaintiff Todd Anderson appeals the district court's grant of summary

judgment to defendant AOL, LLC, formerly known as America Online, Inc.,

("AOL") on his Title VII retaliation claim. Exercising jurisdiction pursuant to 28

U.S.C. § 1291, we AFFIRM.

**I**

On November 30, 1998, Anderson was hired to be a Consultant at AOL's

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

Oklahoma City call center location. Consultants at AOL's Oklahoma City location work in teams which are managed by Customer Support Specialists ("CSSs") and by Coaches, who have supervisory authority over the CSSs. AOL's Oklahoma City location is ultimately managed by the Director of Call Operations or Call Center Manager ("CCM").

Although Anderson unsuccessfully applied for multiple Coach positions during his tenure at AOL, he was promoted to CSS in the spring of 2004. According to the record, however, Anderson began to receive some negative feedback from AOL around that same time. Specifically, some time during 2004, Anderson learned that his supervisor at the time, Patricia Jacobson, was telling other employees that he was "arrogant," "cocky," and "conceited." Aplt. App. at 375. Also that year, Carolyn Lindsey, a Coach at the time, took steps to transfer Anderson out of her department because things were not "working out." Id.

In August of 2005, Anderson received feedback regarding his performance as a CSS. After a performance evaluation by the Consultants that he managed in his capacity as a CSS, Anderson agreed to commit to the following Action Plan:

> I will continue improving my relationship building by allocating time each day (as I have been doing) to build relationships. My lowest score came in taking escalations with the majority happy with the level of support provided but some felt otherwise, definitely room for personal growth. . . . I will communicate more effectively . . . [and t]he goal will be to change the perception in the minority that I don't help just because I had them de-escalate the call with me there to a realization that I taught them how to de-escalate future calls.

2

Id. at 167.  In his self-evaluation of his 2005 performance, Anderson also admitted to having only partially met his objective to "[p]rovide[] frequent coaching and feedback, and offer[] opportunities for growth and development." Id. at 178.

The issues with Anderson's job performance continued in early 2006, when he began to miss work on a frequent basis.  Specifically, Anderson had six unplanned absences between January 1, 2006 and March 20, 2006, which caused Jenn Teel, another AOL Coach, to discuss with Anderson AOL's expectation that as a CSS, he was to have no more than two unplanned absences in a rolling 90-day period in order "to set a dependable example and to provide support for [his] team."  Aplee. App. at 5.  AOL has produced a Situational Feedback Log ("SFL")[1] which it claims was prepared at this time and which reflects Teel's counseling of Anderson.  Id.  Although Anderson has testified—presumably in connection with this incident—that he was urged to refrain from taking certain Family Medical and Leave Act ("FMLA") time, he does not dispute either that Teel counseled him about his unplanned absences in 2006 or that Teel contemporaneously prepared the SFL documenting that counseling.  See Aplt. App. at 110, 112 ("**Q**: [This] is entitled Situation Feedback Log.  Do you recall receiving that document or seeing this document before? **A**: I certainly do.  This

_____

[1] Situational Feedback Logs are documents that AOL uses to make a record of interactions between supervisors and the employees they supervise.

3

was after I was pretty much told I couldn't have FMLA leave anymore. . . . **Q**: Do you remember having a conversation with Jenn Teel about unplanned absences? **A**: A very brief one, less than one minute.").

Sometime later, Rickey Perry, another AOL Coach, invited Anderson to join his team. However, on April 1, 2006, before Anderson was assigned to Perry's team, Anderson had a meeting with the CCM at AOL's Oklahoma City location, Terry Kealamakia. At that meeting Kealamakia admits that Anderson "inquired into the reasons that minorities and females had been promoted [to Coach positions] rather than him." Aplt. App. at 136. Kealamakia informed Anderson that the employees who had been promoted were chosen based on their high performance and that neither their gender nor their race played a part in the decisions. Shortly after Anderson spoke to Kealamakia about AOL's promotion decisions, Anderson noticed Kealamakia, Carolyn Lindsey and Rickey Perry visiting with one another. After their chat, Perry then approached Anderson and told him that he knew that Anderson had spoken to Kealamakia, but that "everything [was] good to go" with respect to Anderson's moving to Perry's team. Id. at 333.

Anderson eventually joined Perry's team, but the newly formed relationship was not without issue. Specifically, AOL has produced two separate SFLs that it claims Perry prepared in the spring of 2006 and which document meetings Perry had with Anderson on April 26, 2006 and on May 2, 2006 to discuss: (1)

4

complaints that Perry had received from several Consultants on the team that Anderson was giving them inaccurate answers and not following up with correct solutions; (2) the team's perception of Anderson's inability to give Consultants "Just in Time Support" with correct information; and (3) Consultants' complaints regarding the condescending attitude they were experiencing from Anderson. Id. at 181-82, 190-91. Anderson denies these conversations with Perry occurred and claims not only that he was not presented with the SFLs at the time they were created, but that they were prepared after his termination.

During the spring of 2006, Anderson went on to unsuccessfully apply for three positions within AOL's Member Operations Support Team ("MOST"), a team that was coming to AOL's Oklahoma City location for the first time. When Anderson expressed interest in the MOST positions, he was told that he could not apply because only employees who were currently working, or had very recently worked, within the Member Account Services ("MAS") were being considered for MOST positions because (1) MAS was being eliminated from the Oklahoma City location and AOL was trying to minimize layoffs, and (2) it was determined that former MAS employees' experience with the most recent MAS policies and procedures would aid their work with MOST which would be using similar policies and procedures.

As Anderson had previously, though not recently, worked within MAS, he was very upset by his inability to get an interview for a MOST position.

5

Accordingly, Anderson testified that on or about May, 17, 2006, he approached Rickey Perry and said, "Rickey, I want something done. . . . I want something done now. [The MAS manager] can't stop me from progressing my career." Id. at 102. Further, Carolyn Lindsey testified that on Friday May 19, 2006, Anderson approached her in AOL's parking lot and told her that he "was extremely frustrated at not being allowed to apply for a position in . . . [MOST]." Id. at 132. Lindsey testified that when she once again explained AOL's policy on the matter, Anderson stated that he needed to "think about it," "did not like it," and would be contacting Perry. Id. Anderson has not disputed Lindsey's testimony regarding this incident.

On or about May 17, 2006, Anderson also learned that two other individuals had recently been promoted to other Coach positions. Anderson testified that while outside waiting for his ride home, he proceeded to call Perry at home and in his own words was "venting, cussing, screaming, yelling," and threatening to quit because he felt that in light of AOL's racist and/or sexist practices, his career would never advance. Id. at 104. Perry spoke with Anderson, calmed him down and told him that the two should speak again on Sunday, May 21, 2006. During their subsequent conversation, Anderson re-iterated his concerns and indicated that he was considering giving a two-week notice before quitting. Perry told Anderson to speak to Carolyn Lindsey about his problems. Anderson also claims that Perry told him it was okay to take Monday

6

off because Perry would put in vacation time for Anderson. AOL has produced two SFLs prepared by Perry which document these phone calls.

Anderson took Monday off and when he arrived at work on Tuesday, May 23, 2006, Perry approached him and counseled him that "he was wrong to have not reported for work on the previous day and that his failure to preplan his time off set a bad example for the Consultants on the team." Id. at 184. Anderson does not deny that shortly thereafter, he was "on the call center floor and claim[ed] that [certain AOL employees] were not qualified for the jobs that they had." Id. at 122. Anderson does, however, deny that while he was still on the call center floor he also referred to the sexual orientation of another AOL employee, claimed that the same employee had a vendetta against him, and referred to yet another employee as a sex offender.

Following the incident on the call center floor, Perry immediately recommended to Carolyn Lindsey, then the Sales Manager, and David Fuzzell, the Human Resources Director, that Anderson be terminated, and each agreed. This decision was ultimately approved by Kealamakia, and Anderson's employment was terminated that afternoon—approximately seven weeks after Anderson had expressed his concerns regarding discrimination to Kealamakia.

After bringing a charge of discrimination with the Equal Employment Opportunity Commission, Anderson filed a Complaint against AOL in the district court which alleged various Title VII violations including race and gender

7

discrimination and retaliation. AOL moved for summary judgment and in response, Anderson chose to "abandon[]" his "gender and race causes of actions . . . based upon a lack of evidence." Id. at 204. The district court then granted AOL summary judgment on the remaining retaliation claim, assuming, without deciding, that Anderson had established a prima facie case, but concluding that Anderson could not establish that AOL's proffered reasons for legitimately terminating him were pretextual. This timely appeal followed.

## II

"We review a grant of summary judgment de novo." Annett v. Univ. of Kan., 371 F.3d 1233, 1237 (10th Cir. 2004). In so doing, "we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." Id. (quoting Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999)). Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c)(2).

"Title VII's antiretaliation provision forbids employer actions that 'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" Burlington

8

N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e-3(a)). Where, as is the case here, a plaintiff provides no direct evidence of such retaliation, we analyze his or her claim under the familiar burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Annett, 371 F.3d at 1237. Under the McDonnell Douglas framework, the plaintiff must first establish a prima facie case of retaliation by demonstrating: (1) that he or she engaged in protected opposition to discrimination; (2) that a reasonable employee would have found the employer's challenged action materially adverse; and (3) that a causal connection exists between the protected activity and the materially adverse action. EEOC v. PVNF, LLC, 487 F.3d 790, 803 (10th Cir. 2007) (quotations and citations omitted).

There is no dispute that Anderson's conversation with Kealamakia and his ultimate termination constitute, respectively, a protected activity, followed by a materially adverse employment action. AOL contends, however, that Anderson has failed to demonstrate a causal connection between his protected activity and his termination. Because, however, the burden of establishing a prima facie Title VII case is "slight," see Orr v. City of Albuquerque, 417 F.3d 1144, 1149 (10th Cir. 2005), and because AOL's causation argument is, in essence, the same argument it advances with respect to pretext, we, like the district court, will assume, without deciding, that Anderson has established a prima facie case.

Thus, under McDonnell Douglas the burden shifts to AOL to produce a

9

legitimate, nondiscriminatory justification for their employment action. Annett, 371 F.3d at 1237. AOL has satisfied this burden by alleging that its decision to terminate Anderson was based on: (1) Anderson's vocally negative reaction to decisions that he did not agree with; (2) AOL's continued concerns regarding Consultants' negative perception of Anderson and Anderson's lack of leadership growth; (3) the fact that Anderson was not an effective resource for his team for support feedback and/or member escalations; and (4) Anderson's behavior on the call center floor on May 23, 2006. Accordingly, Anderson may survive summary judgment only if the evidence creates "a genuine issue of fact as to whether [AOL's] reason[s are] pretextual." Medina v. Income Support Div., N.M., 413 F.3d 1131, 1136 (10th Cir. 2005) (citation omitted).

In order to satisfy this burden, Anderson must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in AOL's proffered reasons "that a reasonable factfinder could rationally find them unworthy of credence." Id. (quotation and citation omitted). In his effort to do so, Anderson begins by focusing heavily on his contention that Lindsey, Perry, and Kealamakia were all aware of his protected activity (his asking Kealamakia why minorities and females were promoted to Coach positions when he was not) prior to his termination. Assuming that this fact is true, it is, however, of minimal significance to our determination of pretext. While the decision maker's knowledge of the plaintiff's protected activity is necessary to establish a prima

10

facie case of retaliation,[2] <u>see, e.g.</u>, <u>Montes v. Vail Clinic, Inc.</u>, 497 F.3d 1160, 1176 (10th Cir. 2007) (noting that in order to establish a prima facie case of retaliation, a plaintiff must show that the individual who took the adverse action knew of the protected activity or used another to "effect her own biased designs" quotations and citations omitted), more evidence is necessary in order to create a reasonable inference of pretext.[3]

To this end, Anderson claims that "the failure of AOL to communicate any aspect of the negative information contained in the SFL's [sic] to [him] while he was still an employee of AOL—or make any effort to impose discipline against him during that time—infers pretext . . . ." Aplt. Br. at 17. More specifically, Anderson contends that it is reasonable to infer that AOL fabricated his workplace transgressions—particularly those detailed in the SFLs prepared by Perry—after his termination from the fact that (1) Perry never verbally advised Anderson about the unsatisfactory work practices detailed in certain SFLs, and (2) despite an AOL policy to the contrary, those SFLs do not bear Anderson's

---

[2]Here, the ultimate decision-maker, Kealamakia, was clearly aware of Anderson's claim of discriminatory promotions because Anderson raised the issue directly with Kealamakia.

[3] If this were not so, an employer would be precluded from summary judgment as soon as a prima facie case was established, and this is not the law. <u>Cf.</u> <u>Christopher v. Adam's Mark Hotels</u>, 137 F.3d 1069, 1073 (8th Cir. 1998) (noting that in the context of <u>McDonnell Douglas</u> burden shifting for an ADA claim "[m]ere knowledge of a disability cannot be sufficient to show pretext; otherwise, summary judgment for an employer would be appropriate only in cases where the employer is completely unaware of the plaintiff's disability.").

11

signature.[4]

We disagree. Indeed, not only has Anderson failed to present any evidence which demonstrates the existence of an AOL policy requiring SFLs to be presented to and/or signed by any employee, Anderson also admits to much of the conduct the unsigned SFLs describe, including a telephone conversation with Perry in which he was "venting, cussing, screaming, [and] yelling." Aplt. App. at 104. Moreover, Anderson's performance evaluation and the Action Plan to which he agreed detail the shortcomings of his employment performance, he testified that at least one of his supervisors found him to be "arrogant," "cocky," and "conceited," see id. at 375, and, most importantly, he does not deny that on the day that he was terminated, he stated, while on the call center floor and within earshot of other AOL employees, that certain AOL employees were not qualified for the jobs that they had. Thus, the undisputed evidence of Anderson's conduct precludes any rational inference that AOL fabricated these specific workplace transgressions.

In the end, the only viable evidence of pretext which Anderson can offer is

---

[4] In the Statement of the Facts section of his appellate brief, Anderson also alleges that "[t]he SFL's [sic] were not included in the documents that the Oklahoma Employment Security Commission (OESC) provided to [him] during the unemployment claim process." Aplt. Br. at 11. This allegation is, however, based on the hearsay statement of an unknown OESC employee, Anderson has admitted that he has no personal knowledge of what would have been contained in his personnel file, see Aplt. App. at 317, and Anderson does not refer this allegation elsewhere in his brief. As such, we will not consider it as part of his argument.

the temporal proximity of his protected activity and his termination. However, we have consistently held that "temporal proximity alone is not sufficient to defeat summary judgment by showing that the employer's proffered reason is actually pretext for retaliation." Pinkerton v. Colo. Dep't of Transp., 563 F.3d 1052, 1066 (10th Cir. 2009) (citation omitted); see also Medina, 413 F.3d at 1138 ("No reasonable jury could conclude that a five-week span of time . . . without more, meets this standard."). Thus, the evidence cannot reasonably support a conclusion that AOL's proffered reasons for terminating Anderson were pretextual and therefore, AOL is entitled to summary judgment on Anderson's Title VII retaliation claim.

## III

We AFFIRM the district court's grant of summary judgment.

Entered for the Court

Mary Beck Briscoe
Circuit Judge