**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 21, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

NICHOLAS SELLMAN,

    Plaintiff - Appellant,

v.

AVIATION TRAINING CONSULTING,
LLC,

    Defendant - Appellee.

No. 23-6138

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:22-CV-00365-D)**
_____

Jason C.N. Smith of the Law Offices of Jason Smith, Fort Worth, Texas, for Plaintiff –
Appellant.

Philip R. Bruce of McAfee & Taft, A Professional Corporation, Oklahoma City,
Oklahoma, for Defendant – Appellee.
_____

Before **HOLMES**, Chief Judge, **EBEL**, and **ROSSMAN**, Circuit Judges.
_____

**EBEL**, Circuit Judge.
_____

Plaintiff Nicholas Sellman contends his former employer, Defendant Aviation

Training Consulting, LLC ("ATC"), declined to renew his employment contract both

because he is a disabled veteran and because he complained about comments his

supervisor made disparaging his disability. Based on these allegations, Mr. Sellman asserted claims against ATC under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213, and the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. §§ 4301–35. In this appeal, Mr. Sellman challenges the district court's decision to grant ATC summary judgment on all his claims. Having jurisdiction under 28 U.S.C. § 1291, we AFFIRM. In doing so, we conclude Mr. Sellman failed to create a triable issue of fact, under the "cat's paw" doctrine, that his supervisor's discriminatory and/or retaliatory animus toward Mr. Sellman caused higher level management to decide not to renew Mr. Sellman's employment contract. We further conclude that, although USERRA protects servicemembers and veterans from employment discrimination related generally to their military service, it does not protect veterans from discrimination because they are disabled.

## I. FACTUAL BACKGROUND[1]

ATC is an Oklahoma-based company founded by Robert Cox, who is a disabled veteran. The company employs a number of disabled veterans.

ATC hired Mr. Sellman, a Marine veteran, for one year—from April 2017 to April 2018—to be a Loadmaster Instructor in Kuwait where ATC had a contract to

---

[1] We view the evidence in the light most favorable to Mr. Sellman, as the non-moving party. See Iweha v. Kansas, 121 F.4th 1208, 1220 (10th Cir. 2024).

2

train Kuwaiti Air Force personnel on flying KC-130 cargo planes.[2]  Mr. Sellman's job duties included both classroom and in-flight instruction.  When he applied for this job, Mr. Sellman voluntarily disclosed to the company, for affirmative action purposes, "that he had a 90% [Veterans Administration] VA disability rating."  (Aplt. App. 16.)  Although not disclosed on the affirmative action form, Mr. Sellman's disability rating was based on post-traumatic stress disorder ("PTSD"), degenerative back disease, and a sleep disorder.  While at ATC, Mr. Sellman spoke only to one co-worker about the bases for his VA disability rating.

For the first five months that he was working for ATC in Kuwait, Mr. Sellman's immediate supervisor was Chief Pilot Richard Sofge and his second-level supervisor was Director of Operations Michael Young.  After September 2017, Mr. Young returned to Oklahoma where he continued to work for ATC as a vice president, Mr. Sofge was promoted to Director of Operations in Kuwait, and Mr. Sellman's new immediate supervisor was Chief Pilot Graham Mueller.  Messrs. Young, Sofge, and Mueller are all disabled veterans.

---

[2] The loadmaster on a KC-130 cargo plane is responsible for, among other things, distributing and securing the cargo in the plane to ensure that the load is balanced and does not shift in flight, which can cause the plane to crash.  The loadmaster also ensures that the types of hazardous cargo are appropriate for each flight.

**A. Director Sofge disparaged Mr. Sellman's VA disability rating and was reprimanded**

In November 2017, Mr. Sellman told both a co-worker and Operations Director Sofge that the VA had increased his disability rating from 90% to 100%. Mr. Sofge responded by making

> inappropriate comments to [Mr. Sellman] regarding his VA disability rating. Although there is some dispute as to Sofge's precise comments, Sofge referred to individuals who "game the system" and how the VA disability system is broken. [Mr. Sellman] alleges that Sofge sarcastically called him a "cripple" and a "criminal" for collecting disability benefits, implying that [Mr. Sellman] was not actually disabled.

(Id.)  According to Mr. Sellman, Mr. Sofge's demeanor toward him cooled after this. So did Mr. Mueller's.

Mr. Sellman complained about Mr. Sofge's comments to ATC's Human Resources ("H.R.") Director, James Williams, who investigated. As a result of that investigation, one of ATC's vice presidents, Dennis Stephens, who is also a disabled veteran, "counseled Sofge that his comments were inappropriate and would not be tolerated. It is undisputed that Sofge did not make any other insensitive or inappropriate comments to [Mr. Sellman] after his counselling." (Id. at 16–17.)

**B. Mr. Sellman's flight certificate expired**

It was a condition of Mr. Sellman's employment that he maintain a flight certificate issued by the Federal Aviation Administration ("FAA"). This flight certificate was required in order for Mr. Sellman to be eligible to fly. It was Mr. Sellman's responsibility to maintain his flight certificate. On November 29, 2017,

4

the FAA notified Mr. Sellman that it needed more information about his medical conditions before the agency could renew his flight certificate, which was to expire three months later, at the end of February 2018. Mr. Sellman first responded to the FAA on January 5, 2018. During January and February 2018, the FAA and Mr. Sellman traded correspondence, with the agency continuing to ask for additional medical information and Mr. Sellman responding.[3] During this time, ATC H.R. Director Williams and Operations Director Sofge knew that the FAA had concerns about renewing Mr. Sellman's flight certificate, and both checked with him periodically about the renewal process. "In January and February of 2018, there was confusion within [ATC's] offices as to whether [Mr. Sellman] was eligible to fly due to the uncertainty regarding [his] FAA flight certificate."[4] (Id. at 17.) In mid-February, Mr. Sellman asked to be taken off a training flight so he could remain in Kuwait to work on renewing his flight certificate. By March 1, 2018, with just over a month remaining on his employment contract, Mr. Sellman's flight certificate

---

[3] The FAA was concerned about Mr. Sellman's history of depression, PTSD, restless sleep, and use of the prescription antidepressant Zoloft. Regarding his use of Zoloft, Mr. Sellman indicated that he had been "told during his annual airman medical physical certificate" in October 2017 "that he would not be granted an FAA certificate while on Zoloft." (I Aple. App. 27 ¶ 26.) Mr. Sellman informed the FAA on January 5, 2018, that he had "stopped taking Zoloft on October 30, 2017 and reported being in a good mood without any side effects and feeling better than while on Zoloft." (Id.)

[4] This confusion appears to have been primarily because Mr. Sellman's flight certificate indicated it expired on February 23, 2018, but ATC eventually discovered from the FAA that the certificate remained valid until the end of the expiration month, February 2018.

expired, making him ineligible to fly. According to ATC's managerial employees, Mr. Sellman "was the first [ATC] flight crew employee to allow an FAA flight certificate to expire." (Id. at 18.) The FAA ultimately renewed Mr. Sellman's flight certificate a few days after it expired.

**C. ATC's negative assessment of Mr. Sellman's job performance**

While Michael Young was the Director of Operations in Kuwait, ATC did not conduct performance reviews of its employees in Kuwait. When Mr. Sofge became the operations director, however, in September 2017, he began developing a process for conducting annual performance reviews for those employees. Implementing that process, Chief Pilot Mueller, on January 9, 2018, met with Mr. Sellman and went over an "Appraisal Support Form," which Mr. Sellman reviewed and signed. (Id. at 165–66.) That form "serve[d] as a guide for the employee's performance appraisal." (Id. at 166.) It included the job description for Mr. Sellman's position, listed accomplishments Mr. Sellman stated he had achieved during the prior nine months with ATC, and listed three objectives Mr. Sellman hoped to accomplish in the future.

Two weeks later, on January 31, 2018, Mr. Mueller completed Mr. Sellman's "Performance Appraisal." (Id. at 167–68.) That form required Mr. Mueller to rate Mr. Sellman's job-related abilities. Mr. Mueller rated Mr. Sellman "satisfactory" in

several categories, including teamwork and technical competence.[5]  (Id.)  But Mr. Mueller

> rated [Mr. Sellman] as "marginal" in dependability, communication skills, and initiative.  Mueller provided additional comments that [Mr. Sellman] "[h]as difficulty completing assigned tasks without direct supervision"; has "difficulty communicating with others in the office" and "will not provide necessary information unless asked directly multiple times"; "[c]onstantly requires direction in order to accomplish assigned tasks"; and "[w]ill not perform any tasks outside directed duties nor provide ideas on improving projects or workspace processes."

(Id. at 17.)  Mr. Sellman did not sign that second performance review form and says he never saw it.[6]

On February 5, 2018, Mr. Mueller emailed his January 31 performance review of Mr. Sellman to Operations Director Sofge.  In the email, Mr. Mueller further noted to Mr. Sofge that Mr. Sellman "ranked 3/3 for loadmaster instructors," meaning Mr. Sellman was the lowest ranked of the three ATC loadmasters in Kuwait, "and [Mr. Sellman's] overall average [fell] at the bottom of the aircrew stack."  (Id. at 17–18.)  Mr. Mueller did not make any recommendation as to whether ATC should renew Mr.

---

[5] ATC also required Mr. Sellman and other flight crew members to pass "an annual NATOPS evaluation," which is a "rigorous" assessment of their flight competency.  (Aplt. Br. 6 (citing Aplt. App. 40–44).)  Mr. Sellman had successfully passed that exam.  ATC has never questioned Mr. Sellman's flight competency.

[6] Mr. Mueller testified in his deposition, to the contrary, that he went over this second form—the performance appraisal—with Mr. Sellman, Mr. Sellman became upset because of the negative review, and he left the office without signing the form.  Viewing the evidence in the light most favorable to Mr. Sellman, see Iweha, 121 F.4th at 1220, however, we accept his version of events.

7

Sellman's one-year employment contract. "Sofge forwarded Mueller's review to [H.R. Director] Williams and [Vice President] Stephens." (Id. at 18.)

Mr. Mueller's negative evaluation of Mr. Sellman's job performance was consistent with Vice President Young's assessment of Mr. Sellman's job performance while Mr. Young was the operations director in Kuwait during Mr. Sellman's first five months there. While operations director, Mr. Young had "observed that [Mr. Sellman's] performance was below other Loadmaster Instructors and [Mr. Young had] told [Mr. Sellman] he needed to 'tighten it up' with his job performance." (Id.)

Three weeks after Mr. Sofge forwarded Mr. Mueller's negative performance appraisal of Mr. Sellman to H.R. Director Williams and Vice President Stephens, Mr. Sofge, on February 27, stated in an email to Mr. Williams and Vice President Young that, "[b]ased on [Mr. Sellman's] sub par performance, I do not want to renew his contract." (Id. at 184–85.) In the same email, however, Mr. Sofge acknowledged that "this is not my call." (Id. at 184.)

## D. ATC decided not to renew Mr. Sellman's contract

> Neither Sofge nor [H.R. Director] Williams had the power to hire, renew contracts, or terminate employees. [Vice Presidents] Young and Stephens made the decision not to renew [Mr. Sellman's] contract because of his subpar performance, as communicated by [Chief Pilot] Mueller's performance review and Young's opinion of [Mr. Sellman] when he was [Mr. Sellman's] supervisor in Kuwait. [ATC's Chief Executive Officer ("CEO")] Cox gave final approval to not renew [Mr. Sellman's] contract based on Mueller's and Young's perceptions of [Mr. Sellman's] subpar performance. Cox found it further indicative of [Mr. Sellman's] performance issues that he did not maintain an FAA flight certificate or flight eligibility, which was required for [Mr. Sellman's] position. When Cox decided to not renew [Mr. Sellman's] contract, he

8

did not know about [Mr. Sellman's] complaint to [H.R. Director] Williams regarding Sofge's inappropriate comments or specific reasons why [Mr. Sellman's] FAA flight certificate had expired.

(Id. at 18.)

## II. PROCEDURAL BACKGROUND

After exhausting his administrative remedies and receiving a right-to-sue letter, Mr. Sellman sued ATC, alleging ATC declined to renew his employment contract 1) because he was disabled or was perceived to be disabled, in violation of the ADA; 2) in retaliation for his complaining to H.R. about disability discrimination, in violation of the ADA; and 3) because he is a disabled veteran and complained about discrimination on that basis, in violation of USERRA. The district court granted ATC summary judgment on all claims. Mr. Sellman challenges each of those rulings.[7]

## III. STANDARD OF REVIEW

This court reviews the district court's summary judgment decision de novo, viewing the evidence in the light most favorable to Mr. Sellman, as the non-moving party. See Iweha, 121 F.4th at 1220. A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

---

[7] We GRANT ATC's unopposed motion to file part of its supplemental appendix under seal.

### IV. DISCUSSION

**A. Mr. Sellman's claims under the Americans with Disabilities Act ("ADA")**

Mr. Sellman asserted two claims under the ADA, alleging ATC decided not to renew his employment contract 1) because of his disability, see 42 U.S.C. § 12112 (prohibiting disability discrimination); and 2) in retaliation for his complaining to H.R. about Mr. Sofge's comments disparaging his disability, see id. § 12203(a).[8] Because Mr. Sellman sought to prove these ADA claims using indirect evidence of disability discrimination and retaliation, the familiar McDonnell Douglas[9] three-step analysis applies.  See Edmonds-Radford v. Sw. Airlines Co., 17 F.4th 975, 989, 994 (10th Cir. 2021).

On appeal, Mr. Sellman does not challenge the district court's ruling at the first and second steps of the McDonnell-Douglas analysis.  At step one, the court assumed, without deciding, that Mr. Sellman had established prima facie discrimination and retaliation claims.  At step two, the district court held that ATC had asserted a legitimate non-discriminatory and non-retaliatory reason why the

---

[8] An employer's decision not to renew an employee's contract is an adverse employment action that can support a claim under federal antidiscrimination laws. See Singh v. Cordle, 936 F.3d 1022, 1038 n.3 (10th Cir. 2019) (Title VII); Cole v. Ruidoso Mun. Schs., 43 F.3d 1373, 1380–81 (10th Cir. 1994) (Title VII).  ATC does not argue to the contrary.

[9] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) (applying Title VII); see also Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252–56 (1981).

company decided not to renew Mr. Sellman's employment contract—because Mr. Sellman was a marginal employee.

Mr. Sellman challenges only the district court's decision, at step three, that Mr. Sellman failed to proffer sufficient evidence to create a triable issue of fact as to whether ATC's reason for not renewing Mr. Sellman's employment contract—that he was a marginal employee—was merely a pretext for disability discrimination and retaliation for complaining about such discrimination.  It is undisputed that it was ATC's vice presidents, Young and Stephens, as well as its CEO Cox, who decided not to renew Mr. Sellman's employment contract.  It is further undisputed that these decisionmakers decided not to renew Mr. Sellman's contract because they deemed Mr. Sellman to be a marginal employee.  That assessment was based on Mr. Mueller's negative evaluation of Mr. Sellman's job performance and the corroboration from one of the decisionmakers, Mr. Young, that he, too, deemed Mr. Sellman's job performance to be inadequate when he supervised Mr. Sellman.

Mr. Sellman disputes that his job performance was inadequate.  But, "[i]n assessing pretext, this Court examines the facts as they appeared to the decisionmakers, and we cannot second-guess [the employer's] business judgment—it matters not if [the employer's] reasoning was correct, just whether it honestly believed in the reason for the termination." Edmonds-Radford, 17 F.4th at 991.  Mr. Sellman points to no evidence indicating that the three decisionmakers did not honestly believe Mr. Sellman's job performance was inadequate.

11

Nor does Mr. Sellman proffer any evidence suggesting that any of these three decisionmakers were acting with a discriminatory and/or retaliatory bias against him. Furthermore, there is no evidence that Mr. Young or Mr. Cox even knew about Mr. Sellman's disability, his VA disability rating, or his complaint to H.R. that Mr. Sofge had disparaged Mr. Sellman's disability.  See id. (rejecting pretext argument where there was no evidence decisionmakers knew about the employee's disability).

Mr. Sellman points only to evidence that one of the three decisionmakers, Stephens, knew about Mr. Sellman's disability rating and his complaint to H.R.  But knowledge about a claimant's disability or his complaint about disability discrimination alone, without more, is insufficient to create a triable fact as to pretext.  See Christopher v. Adam's Mark Hotels, 137 F.3d 1069, 1073 (8th Cir. 1998) ("Mere knowledge of a disability cannot be sufficient to show pretext."); Anderson v. AOL, LLC, 363 F. App'x 581, 586–87 & 587 n.3 (10th Cir. 2010) (unpublished) (holding knowledge of the plaintiff's protected activity, without more, is insufficient to create a reasonable inference of pretext in a retaliation case).[10] Moreover, the evidence established that Mr. Stephens knew about Mr. Sellman's VA disability rating and his complaint to H.R. because it was Mr. Stephens, who is himself a disabled veteran, who reprimanded Mr. Sofge for disparaging Mr. Sellman's disability.  Mr. Sellman offers no evidence that Mr. Stephens harbored a

---

[10] Although Anderson is not binding precedent, we find its reasoning persuasive.

12

discriminatory or retaliatory animus toward Mr. Sellman because of his disability or his complaint to H.R. about disability discrimination.

Because Mr. Sellman lacks any evidence that the three decisionmakers were motivated not to renew his contract by a discriminatory or retaliatory animus toward him, Mr. Sellman invokes the "cat's paw," or biased subordinate, theory to show pretext. See generally Iweha, 121 F.4th at 1227–28 (discussing "cat's paw" theory). "Essentially, '"cat's paw" refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action.'" Id. at 1228 (quoting E.E.O.C. v. BCI Coca-Cola Bottling Co., 450 F.3d 476, 484 (10th Cir. 2006)). "The 'cat's paw' theory of liability 'allows a plaintiff to establish pretext even without evidence that the actual decisionmaker possessed an unlawful motive.'" Id. at 1227 (quoting Singh, 936 F.3d at 1038).

"Under this theory, an employer is liable for engaging in a discriminatory [or retaliatory], adverse employment action 'if a subordinate to the decisionmaker "performs an act motivated by [discriminatory or retaliatory] animus that is intended by the [subordinate] to cause an adverse employment action . . . ."'" Id. at 1227–28 (quoting Singh, 936 F.3d at 1038, in turn quoting Staub v. Proctor Hosp., 562 U.S. 411, 422 (2011)). Further, in the ADA context, the subordinate's act must be the but-for cause of the ultimate adverse employment action. We have held that, for purposes of ADA retaliation claim, the employee must establish that the retaliatory motive was the but-for cause of the adverse employment action See Lincoln v. BNSF

13

Ry. Co., 900 F.3d 1166, 1209 (10th Cir. 2018)  In the context of an ADA disability

employment discrimination claim, we have said that an employee must establish that

his "disability was a determining factor in the employer's decision" to take adverse

employment action.  Hampton v. Utah Dep't of Corr., 87 F.4th 1183, 1187, 1197

(10th Cir. 2023) (applying ADA employment discrimination case law in a

Rehabilitation Act disability in employment case); see also Lincoln, 900 F.3d at 1193

(addressing prima facie ADA claim for disability employment discrimination).

Although we have used the phrase "determining factor," it is not apparent to us that

there is any difference between "determining factor" and "but for" causation.[11] Cf.

Cline v. Clinical Perfusion Sys., Inc., 94 F.4th 926, 928–29, 934–35 (10th Cir. 2024)

(holding Plaintiff adequately pled state law age discrimination employment claim,

which required allegations that age was but-for cause of adverse employment action,

where, among other things, Plaintiff pled that age was "determining factor").  We,

therefore, hold that, in the employment context, an ADA employment discrimination

claim and an ADA retaliation claim require proof that the employee's disability was

the but-for cause of the adverse employment action.

---

[11] Other circuits have recognized that employment disability discrimination claims asserted under the ADA's Title I require proof that the employer's discriminatory animus was the but-for cause of the adverse employment action.  See Murray v. Mayo Clinic, 934 F.3d 1101, 1106 (9th Cir. 2019); Natofsky v. City of N.Y., 921 F.3d 337, 348–49 (2d Cir. 2019) (joining Fourth, Sixth, and Seventh Circuits).

To survive summary judgment, then, when asserting the cat's-paw theory of liability under the ADA, a plaintiff must show that there is a genuine issue of material fact that (1) the subordinate took action motivated by discriminatory or retaliatory animus; (2) the subordinate intended the action to cause an adverse employment action; and (3) the subordinate's action was the but-for cause of the intended adverse employment action.  See Singh, 936 F.3d at 1038; see also  Lincoln, 900 F.3d at 1209.

"The key element of a successful cat's paw theory of pretext is an unbroken causal chain connecting the biased employee's action to the unbiased decisionmaker's adverse decision." Iweha, 121 F.4th at 1228.  Relatedly,

> a "necessary" element to a subordinate bias claim is the decisionmaker's uncritical "reli[ance]" on facts provided by a biased supervisor. . . . If there is no such reliance—that is to say, if the employer independently verifies the facts and does not rely on the biased source—then there is no subordinate bias liability.

Lobato v. N.M. Env't Dep't, 733 F.3d 1283, 1294 (10th Cir. 2013) (quoting Staub, 562 U.S. at 421); see also BCI Coca-Cola Bottling, 450 F.3d at 485.  Thus, "[a] cat's paw theory can be defeated by showing a break in the causal chain, or a lack of uncritical reliance by the unbiased decisionmaker." Iweha, 121 F.4th at 1228.

Mr. Sellman primarily contends that Mr. Sofge was the biased subordinate. There is evidence—specifically the disparaging comments that Mr. Sofge made to Mr. Sellman about his VA disability rating—that would support finding that Mr.

15

Sofge had an animus against Mr. Sellman because of his disability.[12]  Arguably from this evidence a reasonable factfinder could also infer that Mr. Sofge might have wanted to retaliate against Mr. Sellman for complaining to H.R. about those comments, which resulted in Mr. Sofge being reprimanded.

We need not decide these issues because there is no evidence that Mr. Sofge duped the decision makers into not renewing Mr. Sellman's contract.  Mr. Sofge did state to H.R. Director Williams and decisionmaker Young, in an email discussion of Mr. Sellman's poor job performance and what to do with Mr. Sellman if his flight certificate lapsed, that he (Mr. Sofge) did not want to renew Mr. Sellman's contract because of his subpar job performance.  Mr. Sofge further acknowledged, however, that "this is not my call" to make.  (Aplt. App. 184.)

Moreover, Mr. Sofge's statement about not wanting to renew Mr. Sellman's contract came three weeks after Mr. Sofge had transmitted Mr. Mueller's detailed negative performance appraisal of Mr. Sellman to Mr. Williams and decisionmaker Young, and approximately five months after Mr. Young himself told Mr. Sellman he needed to "tighten . . . up" his work performance (id. at 18).  The evidence is undisputed that, when Mr. Stephens and Mr. Young decided not to renew Mr. Sellman's contract, and CEO Cox approved that decision, they relied on Mr. Mueller's negative performance evaluation of Mr. Sellman, Mr. Young's own

---

[12] Technically, the evidence suggested Mr. Sofge was biased against Mr. Sellman because Mr. Sofge did not think Mr. Sellman was disabled and believed, instead, that Mr. Sellman was "gaming" the VA disability system.

knowledge of Mr. Sellman's inadequate job performance, and the fact that Mr. Sellman let his FAA flight certificate lapse. Those independent grounds for higher-up decisionmakers deciding not to renew Mr. Sellman's contract are sufficient to defeat Mr. Sellman's cat's paw theory. There is no suggestion that the decisionmakers blindly followed Mr. Sofge's brief statement that he did not want to renew Mr. Sellman's contract.

Nor is there any evidence that Mr. Sofge affected Mr. Mueller's critical evaluation of Mr. Sellman. Mr. Sellman suggests that maybe it was Mr. Mueller, the person who completed Mr. Sellman's negative performance appraisal, who was the biased subordinate who duped ATC decisionmakers into not renewing Mr. Sellman's contract. But there is no evidence suggesting that Mr. Mueller harbored any discriminatory or retaliatory bias against Mr. Sellman.

To begin with, there is no evidence that Mr. Mueller even knew about Mr. Sellman's complaint to H.R.—which is the basis for Mr. Sellman's retaliation claim. Nor is there any evidence that Mr. Mueller knew about Mr. Sellman's VA disability rating, which is the basis of his discrimination claim. Mr. Sellman speculates that maybe Mr. Mueller was in his nearby office when Mr. Sofge loudly disparaged Mr. Sellman's disability rating. But Mr. Sellman proffers no evidence from which a reasonable jury could find that that was the case.

Even if there was evidence that Mr. Mueller overheard Mr. Sofge disparaging Mr. Sellman's disability rating (and there is none), there is no evidence that Mr. Mueller, also a disabled veteran, had an animus against Mr. Sellman because of his

17

disability rating.  The most that Mr. Sellman can muster in support of this assertion is that, after Mr. Sofge's disparaging comments, both Mr. Sofge's and Mr. Mueller's demeanors cooled toward Mr. Sellman.  That, alone, is insufficient for a reasonable jury to find that Mr. Mueller knew about Mr. Sellman's VA disability rating and held a discriminatory animus against Mr. Sellman as a result.

Mr. Sellman further asserts that Mr. Mueller's negative performance appraisal of him is not worthy of credence, and thus is evidence of pretext, because of the procedural irregularities, including the fact that Mr. Sellman never signed that evaluation.  See generally Kincaid v. Unified Sch. Dist. No. 500, 94 F.4th 936, 947 (10th Cir. 2024) (noting "[p]retext can be shown by such weaknesses, implausibilities, inconsistencies, incoherence, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted [nondiscriminatory] reasons" (quoting Jencks v. Modern Woodmen of Am., 479 F.3d 1261, 1267 (10th Cir. 2007)).  We are unpersuaded.

First, it is undisputed that ATC had not previously been conducting annual performance reviews with its employees in Kuwait.  Notwithstanding Mr. Sellman's assertion that Mr. Mueller failed to follow ATC's "normal procedures" when he conducted Mr. Sellman's review (Aplt. Br. 21), those reviews had not previously been conducted.  It would, therefore, be difficult to conclude that Mr. Mueller failed to follow the normal procedures for such a review.

18

Even if ATC's normal procedure was to have employees sign their performance appraisals, "[t]he mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that . . . the substantive reasons given by the employer for its employment decision were pretextual." Berry v. T-Mobile USA, Inc., 490 F.3d 1211, 1222 (10th Cir. 2007) (quoting Randle v. City of Aurora, 69 F.3d 441, 454 (10th Cir. 1995)). There is no evidence that Mr. Mueller held a discriminatory (or retaliatory) animus against Mr. Sellman because of his VA disability rating. Nor is there any suggestion that Mr. Mueller did not believe that Mr. Sellman was a poor performing employee. In fact, the evidence in the record supported the belief that Mr. Sellman was a poor performer. Mr. Mueller's review, for instance, was consistent with Mr. Young's assessment of Mr. Sellman's poor job performance several months before Mr. Sofge made disparaging comments about Mr. Sellman's VA disability rating.

Mr. Sellman further asserts that the evaluation Mr. Mueller conducted "use[d] . . . subjective criteria," which "can also establish pretext." (Aplt. Br. 23.) But Mr. Sellman does not explain that assertion further. See Hiatt v. Colo. Seminary, 858 F.3d 1307, 1323 (10th Cir. 2017) (rejecting pretext argument based on alleged subjective criteria for how plaintiff could return to her supervisory role because plaintiff failed to explain how the criteria was subjective). We have previously noted that "[c]ourts view . . . subjective evaluation methods" "with skepticism." Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1218 (10th Cir. 2002). In Garrett, for example, supervisors ranked all employees from best to worst, without adopting any criteria,

19

let alone objective criteria, for how that ranking should be determined. See id. at 1217–18. Here, on the other hand, Mr. Mueller noted specific deficiencies in Mr. Sellman's job performance which, although arguably not all based on objective criteria, were specific and detailed. For example, Mr. Mueller noted that Mr. Sellman "[h]as difficulty completing assigned tasks without direct supervision. Examples include coordinating and executing HAZMAT compliance." (Aplt. App. 167.) For another category, Mr. Mueller noted: "Sellman has difficulty communicating with others in the office regarding personal and professional matters. Whether it's a personal matter affecting attendance and work output or progress on an assigned task[,] he will not provide necessary information unless asked directly multiple times." (Id. at 168.) Even if we were to conclude that the criteria Mr. Mueller applied to measure Mr. Sellman's job performance was subjective, "the existence of subjective criteria alone is not considered evidence of pretext." Debord v. Mercy Health Sys. of Kan., Inc., 737 F.3d 642, 657 (10th Cir. 2013) (quoting Riggs v. AirTran Airways, Inc., 497 F.3d 1108, 1120 (10th Cir. 2007)). We, therefore, reject Mr. Sellman's cat's paw theories.

We have assumed, then, as did the district court, that Mr. Sellman was able to assert prima facie discrimination and retaliation claims under the ADA. But we agree with the district court that Mr. Sellman failed to proffer sufficient evidence to create a triable issue of fact as to whether ATC's asserted reason for not renewing Mr. Sellman's contract—that he was a marginal employee—was a pretext for disability discrimination or for retaliation for Mr. Sellman's complaint to H.R. about

20

Mr. Sofge disparaging his disability rating. We, therefore, affirm summary judgment for ATC on both of Mr. Sellman's ADA claims.

## B. Mr. Sellman's claims under the Uniformed Services Employment and Reemployment Rights Act ("USERRA")

Mr. Sellman also alleged that ATC violated USERRA, 38 U.S.C. §§ 4301–35, by refusing to renew his contract because of his disability, and in retaliation for complaining about disability discrimination. The district court granted ATC summary judgment, ruling "USERRA's protections do not extend to disability status." (Aplt. App. 20.) We agree.

Relevant here, Congress enacted USERRA for the purpose of "prohibit[ing] discrimination against persons because of their service in the uniformed services," 38 U.S.C. § 4301(a)(3), which include the "Armed Forces," id. § 4303(17). To that end, USERRA provides, in relevant part, that

> [a] person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.

Id. § 4311(a). USERRA also includes an anti-retaliation provision. See id. § 4311(b). Thus, "USERRA 'prohibits employment discrimination on the basis of military service.'" Kelly v. Omaha Pub. Power Dist., 75 F.4th 877, 882 (8th Cir. 2023) (quoting Rademacher v. HBE Corp., 645 F.3d 1005, 1010 (8th Cir. 2011)).

21

Mr. Sellman does not allege that ATC discriminated against him because of his military service; that is, because he had previously served in the Marines. See Starr v. QuikTrip Corp., 655 F. App'x 642, 645–46 (10th Cir. 2016) (unpublished) (holding, in USERRA action, that the plaintiff "bears the initial burden of proving by a preponderance of the evidence that his status as a service-member was 'a motivating factor'" in the employer's decision to take adverse action against the plaintiff).[13]

Mr. Sellman's USERRA claim is instead that ATC refused to renew his contract because of the VA disability rating he had as a result of his prior military service. Such a claim does not fall within 38 U.S.C. § 4311(a)'s statutory language. See Carroll v. Del. R. Port Auth., 89 F. Supp. 3d 628, 630 (D. N.J. 2015) ("hold[ing] that claims of discrimination based on a disability arising from military service are not cognizable under USERRA," citing cases); Ferrell v. Ezpawn Okla., Inc., No. CIV-18-607-SLP, 2019 WL 3207797, at *3 (W.D. Okla. July 16, 2019) (unreported) (ruling that alleged discrimination based on plaintiff's "disability suffered during his military service . . . is not within the scope of USERRA's protections"); id. at *4 (stating that "Plaintiff's claim is based on his disability, not his military service, and '[w]here a veteran argues that something other than his . . . military status was the actual substantial or motivating factor for an adverse employment action, a USERRA claim does not lie'" (quoting Norris v. Glassdoor,

---

[13] Though unpublished, we find Starr's reasoning persuasive.

Inc., No. 2:17-cv-00791, 2018 WL 3417111, at *6 (S.D. Ohio July 13, 2018) (unreported)); see also, e.g., Kelly v. Omaha Pub. Power Dist., 604 F. Supp. 3d 800, 807–08 (D. Neb. 2022) (in USERRA case involving denial of tuition assistance benefits, discussing analogous cases holding "employer does not violate USERRA if it denies some benefit of employment because an employee suffered a service-related disability"), aff'd, 75 F.4th 877 (8th Cir. 2023).

Our conclusion is bolstered by the fact that a different USERRA provision addressing reemployment of service members does expressly address the reemployment of disabled servicemembers. See 38 U.S.C. § 4313(a)(3), (b)(2)(B). But the provisions Mr. Sellman invokes in this case, the discrimination and retaliation provisions found in § 4311, do not include protections for disabled veterans.

While we agree generally with Mr. Sellman's assertion that USERRA should be broadly construed in favor of military service members, see, e.g., Kelly, 75 F.4th at 882, Mr. Sellman asks this court to recognize a USERRA claim that clearly falls outside the relevant statutory language. We, therefore, affirm summary judgment for ATC on Mr. Sellman's USERRA claims.

## V. CONCLUSION

For these reasons, we AFFIRM the district court's decision granting ATC summary judgment on each of Mr. Sellman's claims.